## WILLIAMS et al. v. HANNA.

No. 19881.   Opinion Filed Sept. 22, 1931.

Rainey, Flynn, Green & Anderson, Hamilton, Gross & Howard, G. C. Spillers, Fred D. Oiler, and Calvin Jones, for plaintiffs in error.

Wilson & Duncan, Neal E. McNeill, and R. W. Stoutz, for defendant in error.

HEFNER, J. This is an action brought in the district court of Osage county by Dessa L. Hanna against P. R. Williams and others to recover commission for the sale of oil properties.

The defense was that she was not authorized to sell the properties by any of the defendants except Williams, and that she was not the procuring cause of the sale.

Defendants further alleged that a sale of the property was consummated through the efforts of F. C. Stewart; that Stewart thereafter brought an action in the district court of Tulsa county against defendants to recover a commission; that he succeeded in obtaining a judgment against them, which judgment was, on appeal, affirmed by this court (Winemiller v. Stewart, 125 Okla. 230, 257 P. 288); and that they thereafter paid the judgment.

The trial was to a jury, resulting in a verdict and judgment in favor of plaintiff for the sum of $34,125. At the close of the evidence defendants requested the trial court to direct a verdict in their favor. The denial of this request is one of the main assignments of error, and, as we view the case, is the only assignment which requires consideration, as, in our opinion, the request should have been granted.

The evidence on behalf of plaintiff, in substance, establishes the following facts: That plaintiff inquired of H. H. Brenner, one of the defendants and an owner of a small interest in the properties here involved, as to whether he had or knew of any oil producing properties for sale. Brenner advised her that he had a small interest in certain properties, but that he had no authority to authorize her to sell the same, and referred her to defendant P. R. Williams and advised her that he was the only person connected with the properties who could deal with her or handle and deliver the properties. She thereafter communicated with Williams, and he authorized her to find a purchaser for the properties for a consideration of $800,000, and agreed to pay her a 5 per cent. commission. Thereafter she engaged James G. Glenn, Mrs. E. R. Ash, and R. J. Eli, oil brokers at Tulsa,

to assist her in selling the properties. These brokers, after informing themselves as to the condition of the properties, made maps thereof and presented them to Mr. Day, who, though at that time an employee of the Tidal Oil Company, had no authority to make a purchase of the properties. His duty was to go over propositions, eliminate those that he did not think the company would be interested in, and submit to the proper officials those that he thought the company would be interested in. Plaintiff received from Williams the following letter:

"Wynona, Okla., Oct. 25, 1923.
"Miss Hanna,
"Pawhuska, Okla.

"Dear Miss Hanna: Relative to our leases in 24-9, west of Wynona, the 640-acre tract, beg to advise that, if any one reports to you that they have this property listed for six hundred thousand dollars, they are telling something that is absolutely false.

"We have never offered this property for anything like that figure, have turned down a cash offer of eight hundred thousand dollars, so the price I made you is the least cash offer we will consider.

"In connection therewith, beg to advise that a good well was brought in offsetting our east line yesterday evening. It is too early to know what it will make, but it has all the appearances of a good producer.

"This makes all our holdings look much better, as it almost proves the entire tract.

"Again assuring that nothing less than the price I gave you will interest us in any manner, beg to remain,

"Yours very truly,
"P. R. Williams."

This letter, together with other information as to production and logs of the wells, was thereafter presented by Mr. Eli to Day, who, after examining the data furnished, stated that his company was interested in the properties, but that he could give no definite answer for the reason that Mr. Haskell was then out of town. Thereafter, and on the 17th day of November, 1923, the Tidal Oil Company purchased the properties for the sum of $700,000.

The evidence on behalf of defendants is, in substance, as follows: Sometime in the early part of November, Frank Haskell, who was then in New York and president of the Tidal Oil Company, arrived in the city of Tulsa. On his arrival he saw F. C. Stewart, a former employee of the company, and informed him that the company was interested in procuring oil-producing properties and engaged him to locate and negotiate for such properties. Stewart thereafter got in touch with J. H. Winemiller and L. W. Baxter, who also owned an interest in the properties involved, and finally succeeded in closing a deal for the purchase thereof for the sum of $700,000. It appears, however, that one of the parties interested in the properties refused to sell his interest and the value of this interest was deducted from the purchase price, making the price for the interest sold the sum of $682,500. Stewart testified that he was employed by Haskell to purchase the properties at the lowest price possible; that he was not working in the interest of the owners of the properties, but informed them that he was acting in the capacity of a middleman, and that in the event of a sale he expected a commission, and that defendants agreed to pay him a 5 per cent. commission.

Defendants also conclusively establish that Day had no authority to enter into a contract to purchase the properties. The evidence is also conclusive that at the time Stewart commenced negotiations with Winemiller and Baxter for the purchase of the properties, the officers of the company who had authority to make the purchase had no knowledge of the prior negotiations between plaintiff and Day. Day testified that he did not seriously consider the proposition submitted to him by plaintiff, and that he did not submit this proposition to Haskell or any other official of the company. This evidence is uncontroverted and is corroborated by Haskell and other officials. It is not claimed that plaintiff or her associates submitted the properties to any one connected with the company other than Day. In our opinion, the evidence is insufficient to establish the fact that plaintiff was the procuring cause of the sale. The property was purchased by the Tidal Oil Company through its agent, Stewart, without knowledge of the prior dealings and transaction between plaintiff and her associates and Day. The deal was closed without assistance from plaintiff and the sale was not induced by or through her efforts. She is therefore not entitled to recover.

There is an allegation in plaintiff's petition that defendant Williams gave her the exclusive right to sell the property. This allegation is not supported by the evidence. Plaintiff, however, contends that the question of the sufficiency of the evidence to support a verdict in her favor is foreclosed by what was said on a former appeal of the case. Hanna v. Williams, 128 Okla. 134, 261 Pac. 923. The appeal was from an order granting a new trial. In affirming the judg-

ment, the Commissioner writing the opinion, among other things, said:

"The record discloses that the court granted the new trial on the sole ground that the evidence was insufficient to support the verdict. The evidence is conflicting, and there is no doubt that there was sufficient evidence upon which to submit the case to the jury. The trial court would have committed error had it sustained a demurrer to the evidence. * * *

"As the case must be retried, we refrain from discussing the evidence only to say that a verdict, either way, when approved by the trial court, would without doubt be upheld on appeal."

These statements, though merely dictum under the evidence then presented, were probably correct. The evidence is stronger against plaintiff on this trial than it was on the former trial. Day and other officials of the company who testified at the present trial did not testify at the former trial. Frank Haskell testified to additional facts to those testified by him on the former trial. It was not made clear on the former trial that at the time the Tidal Oil Company commenced negotiations with defendants for the purchase of the property it had no knowledge of the proposition submitted by plaintiff to Day for the sale of the property. The evidence on the former trial showed that shortly after plaintiff's proposition for sale of the properties was submitted to Day and was advised by Day that he could not give a definite answer for the reason that Haskell was out of town, Haskell appeared in the city of Tulsa and immediately got in touch with Stewart, who, as agent for Tidal Oil Company, closed a contract in behalf of the company for the purchase of the properties. This evidence and the circumstances surrounding the transaction not having been explained, the reasonable inference was that negotiations for the purchase of the properties were commenced by the Tidal Oil Company through its agent, Stewart, upon the proposition submitted by plaintiff to Day. Defendants, upon retrial, introduced evidence that rebutted that inference. They have conclusively shown that, at the time the properties were purchased by the Tidal Oil Company, its purchasing officers had no notice or knowledge of the proposition submitted by plaintiff to Day. This, we think, constitutes a material difference in the evidence.

Judgment is reversed, and the cause remanded, with directions to enter judgment in favor of defendants.

LESTER, C. J., CLARK, V. C. J., and CULLISON, SWINDALL, and KORNEGAY, JJ., concur. RILEY, J., dissents. ANDREWS, J., absent. McNEILL, J., absent and not participating.

---

KORNEGAY, J. (concurring). I concur in the result that is reached by the majority in this case in holding that Dessa L. Hanna, the defendant in error, was not entitled to a commission on the sale involved in this case. I do not believe that her case should have ever gone to the jury on her own showing.

The undisputed facts are that the leases on the land sold belonged to several different parties, and Mr. Williams, one of the plaintiffs in error, had an interest in some of the leases, but by no means a controlling one. At the solicitation of the plaintiff below, who had never sold any oil leases before, and was a stenographer in the office of the county judge, he permitted her to get a buyer at $800,000 on this property. If she did so, she would be entitled to a commission of 5 per cent. on this amount. She did not agree with Mr. Williams to do anything towards getting a purchaser. There was no claim made in the evidence that she had the exclusive right of sale. She did very little. So far as the property being for sale was concerned, it had been on the market for quite a while, and had been withdrawn at the time she spoke to Mr. Williams about it. She got some parties at Tulsa to help her, and they got a statement as to the oil runs, and made a rough map as to the property and its development, and exhibited that map to someone connected with the Tidal Oil Company, and was told that $500,000 was all the property would bring.

Some doubt was expressed as to her authority to deliver the property if further negotiations were to be had. With a view of showing her authority to handle it, she got a letter from Mr. Williams, which is found in the record at page 159, as follows:

"Wynona, Oklahoma,
"Oct. 25, 1923.
"Miss Hanna,
"Pawhuska, Okla.
"Dear Miss Hanna:
"Relative to our leases in 24-9, west of Wynona, the 640-acre tract, beg to advise that if any one reports to you that they have this property listed for six hundred thousand dollars, they are telling something that is absolutely false.

"We have never offered this property for anything like this figure, have turned down a cash offer of eight hundred thousand dollars, so the price I made you is the least cash offer we will consider.

"In connection therewith, beg to advise that a good well was brought in offsetting our east line yesterday evening. It is too early to know what it will make, but it has all the appearance of a good producer.

"This makes all our holdings look much better, as it almost proves the entire tract.

"Again assuring that nothing less than the price I gave you will interest us in any manner, beg to remain,

"Yours very truly,
"P. R. Williams."

Her testimony with reference to this letter can be found on page 157 of the record, and is as follows:

"Q. And what was this conversation that took place between Mr. Williams and yourself? A. I told Mr. Williams that we wanted a letter showing that we had authority to deliver the leases, and that we also wanted a letter to show the amount that they would take for the leases, and that I wanted him to address the letter to me, but to send it to Mr. Glenn at Tulsa."

At no time did she claim that she ever found a purchaser for the minimum amount that she was allowed to work on. So far as the actual expenditure of time and money is concerned, made by Miss Hanna and her associates, it was a matter of comparatively nothing. Her contract, if any she had aside from this letter, was purely oral, as shown by her testimony:

"Q. Detail to the jury what that conversation was. A. I told Mr. Williams of my conversation with Mr. Brenner and that Mr. Brenner had informed me that he was the only man that could deliver those leases for sale and asked him if he would allow me to try to sell those leases and he told me he would, and that he was the only man that could deliver these. Mr. Spillers: If the court please, in that connection we object to this statement concerning Mr. Williams' power to represent any other than himself, the declarations of an agent was not binding upon any of the other defendants. The Court: The objection is overruled. Mr. Spillers: Exception. By Mr. Duncan: Q. Was that all of that conversation? A. No, during the conversation there was something said about commission, and Mr. Williams told me that the usual commission paid for the sale of leases of that character was five per cent., and that their sale price was $800,000, and that if I sold the lease—the leases for them that they would allow me a commission of five per cent. on that sale price. Q. And was anything said in that conversation, Miss Hanna, about your having exclusive authority to sell this property? Mr. Howard: We object to that as leading and suggestive. The Court: It is leading, Mr. Duncan; let her detail the conversation. By Mr. Duncan: Q. All

right, go ahead and detail anything else that was said in that conversation. A. Mr. Williams told me that those leases were off the market, but that if I could sell it he would give me the right to do so."

When the sale was made, she knew nothing about it, neither did her associates. Her further testimony is as follows:

"Q. Now, under that arrangement, just what was Mr. Glenn to do? A. Mr. Glenn was to get a buyer for these leases and consummate a sale. Q. At what price? A. $800,000. Q. Did he ever do that? Mr. Duncan: We object to that as calling for a conclusion of the witness. The Court: Overruled. Mr. Duncan: Exception. Mr. Howard: The court says you may answer, Miss Hanna. A. Well, I don't know that he had—I wasn't in Tulsa, Mr. Howard, and I cannot answer for what Mr. Glenn done at Tulsa. By Mr. Howard: Q. Did Mr. Glenn ever report to you that he had a buyer for this property? A. He certainly did. Q. At $800,000? A. No, not at $800,000. Q. You never had any other price except $800,000? A. Mr. Williams assured me $800,000 was the least that they would take for that lease. Q. I say that is the only price you ever had? A. Yes, the only price I ever had. Q. So, did you ever submit to Mr. Williams the price of $800,000 on this property? A. No, sir, I did not. Q. Did you ever submit any price to him? A. I did not. * * * By Mr. Howard: (C.-M. p. 180) Q. I believe you said in your direct examination that Mr. Williams at the time you first talked to him told you that this property was off the market? A. He did. Q. But that if you cared to take it and try to sell it, he would give you a right to do so? A. Yes, sir. Q. Was that the extent of your agreement? A. That is just about. Q. That is just about all that was said about it, and that $800,000 was the least that would buy the property? A. Absolutely."

As disclosed by the record, Mr. Glenn made "Exhibit B," found in the record at page 191, which was a rough draft of the production, and in the corner of it he has a memorandum, as follows:

"$800,000.00
were offered
$1,000,000.00
held up for
$1,200,000.00."

It is very evident from this testimony that $800,000 was the minimum offer that under this arrangement could be made. As to the authority to bind the other parties besides Williams, so that they would be liable for the whole judgment, there is nothing in this record authorizing a holding that they were bound in any manner by what Williams did. The interest that they had was an interest in land, and the statute

of frauds is such in our state that the authority of Williams to bind the other parties would have to be in writing, as it appears to me. Section 5034, O. O. S. 1921, is as follows:

"5034. Statute of frauds. The following contracts are invalid, unless the same, or some note or memorandum thereof, be in writing and subscribed by the party to be charged, or by his agent: * * *

"Fifth: An agreement for the leasing for a longer period than one year, or for the sale of real property, or of an interest therein; and such agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent be in writing, subscribed by the party sought to be charged."

The case of Woodworth v. Franklin, 85 Okla. 27, 204 P. 452, is cited under that section. Most clearly, under that case, the authority of Williams to put the interest of his co-owners into the hands of any one as a broker would have to be evidenced by writing.

In this case, a judgment by the court was entered against everybody having any interest in the property, for the full amount of the 5 per cent. commission on the whole sale, that is, $34,125, though the interest of some of the parties, against whom this judgment was by the court below rendered, would not have equalled one-third of what this commission judgment is. At the best, all that Miss Hanna had was an offer to pay her 5 per cent. commission if she got a purchaser for $800,000. Of course, if she was going to act as agent, she owed a duty to the people for whom she was acting to get all over $800,000 she could, but she was not permitted to get any commission unless she found a purchaser for $800,000. She frankly admits that $800,000 was the minimum price, and the highest she ever heard of being offered was $500,000.

The principles of making a contract are such that she must have bound herself some way to make an effort to sell the property, or must have sold it on the terms proposed. Had she found a buyer at $800,000 and communicated with Mr. Williams, she might be in a position to claim a commission, so far as he was concerned, but the law of contracts is such that the other people, who own this property, without consent being given in a lawful manner, and based on a lawful consideration, were in no wise bound to pay a commission for its sale. The negotiation between her and Mr. Williams

amounted to nothing more than an offer on the one side with no performance on the other. The elementary work of Clark on Contracts illustrates the points here involved. See Clark on Contracts, sec. 66, pages 21 and 22, also secs. 14, 19, and 26.

The Statutes of Oklahoma, in a large measure, say enough to preclude the plaintiff below from recovering any commission in this case. Sections 5008 and 5009, C. O. S. 1921, are sufficient to show that on a proposition to get a commission in this case Miss Hanna would have to get a buyer at $800,000. The said sections are as follows:

"5008. Acts which are an acceptance. Performance of the conditions of a proposal, or the acceptance of a consideration offered with a proposal, is an acceptance of the proposal.

"5009. Acceptance must be absolute. An acceptance must be absolute and unqualified, or must include in itself an acceptance of that character, which the proposer can separate from the rest, and which will include the person accepting. A qualified acceptance is a new proposal."

Under the evidence in this case, most favorable to the plaintiff, she would not have been entitled to a commission unless she brought a purchaser at the price of $800,000, as it was a special condition of the proposal of Mr. Williams that she should get a purchaser at that price, and the only writing in the case, bearing on the point, was a letter that later Mr. Williams sent to her in which the $800,000 was a minimum price. After that she or her agents do not appear to have done anything more that was conducive to the sale.

It looks as though, from the appearance of the record in this case, nearly everybody in the country must have put this sale over, as the parties have already paid one commission, and have been sued by two other parties, and have been haled into this court on a proceeding in error, and now find themselves with a judgment for the recovery of the same commission at the hands of the defendant in error.

I do not think it necessary to go into the evidence introduced on behalf of the defendants below to arrive at the conclusion that the plaintiff below was not entitled to the judgment. I think the motion to direct the verdict should have been sustained at the conclusion of the plaintiff's evidence.

See under (1) 4 R. C. L. 307, 308; R. C. L. Perm. Supp. p. 1110.